UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  09/28/2021
```

JANE STONE #1; JANE STONE #2; JANE
STONE #3; JANE STONE #4; JANE
STONE #5; JANE STONE #6,

                              Plaintiffs,

                    v.

ANTHONY J. ANNUCCI, *et al.*,

                              Defendants.

No. 20-CV-1326 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

This action is brought by six women who are or were incarcerated at four prison facilities

operated by the New York State Department of Corrections and Community Supervision

(DOCCS) and who were allegedly raped and sexually abused at the hands of correction officers.

Proceeding anonymously, they brought suit pursuant to 42 U.S.C. § 1983 and New York law

against Anthony J. Annucci, the Acting Commissioner of DOCCS; Jason Effman, the Associate

Commissioner and Prison Rape Elimination Act Coordinator for DOCCS; Susan Squires, the

superintendent of Albion Correctional Facility; Sabina Kaplan, the superintendent of the Bedford

Hills Correctional Facility; Brian Kubik, the superintendent of Lakeview Shock Incarceration

Correctional Facility; Tanya Mitchell-Voyd, superintendent of the Taconic Correctional Facility;

fourteen correction officers; and two DOCCS investigators.[1] Plaintiffs assert that some of the

correction officers subjected them to cruel and unusual punishment in violation of the Eighth

Amendment to the United States Constitution, and that other defendants, including the senior

---

[1] The correction officers sued are James W. Castonguay, Jordan Middlebrooks, Willie Smith, David Stupnick, Naresh Deosarran, Jose Guzman, Tiffany Paige, Rasheen Smalls, Matthew Antolini, James Beam, Juan Vasquez, Nancy Lopez, Keffion Lovelace, and Pedro Norde. The investigators sued are Melinda Hanzlian and Alvi Castro.

prison officials, were deliberately indifferent to serious risks to their safety. Before the Court is a motion filed by Defendants Annucci, Effman, Kaplan, Kubik, and Squires (the "Supervisory Defendants") seeking (1) to dismiss the claims against Annucci and Effman for failure to state a claim or to grant them qualified immunity; (2) to dismiss the claims against Kaplan as untimely; and (3) to dismiss the claims against Squires and Kubik for improper venue or alternatively to sever those claims and transfer them to the Western District of New York.[2] *See* Memorandum of Law in Support of Supervisory Defendants' Motion ("Def. Mem."), Dkt. 83. For the following reasons, the Court declines to dismiss the claims against Annucci and Effman, dismisses the claims against Kaplan (as well as other untimely claims brought by Jane Stone #5), and severs and transfers to the WDNY the claims against Squires and Kubik.

## BACKGROUND

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint, Dkt. 56 (the "Complaint" or "SAC"), and are assumed to be true for the purpose of resolving this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

The Complaint alleges a series of rapes and sexual assaults committed by correction officers against inmates at four DOCCS facilities: Albion Correction Facility in Albion, New York ("Albion"); Bedford Hills Correctional Facility in Bedford Hills, New York ("Bedford Hills"); Taconic Correctional Facility in Bedford Hills, NY ("Taconic"); and Lakeview Shock Incarceration Correctional Facility in Brocton, New York ("Lakeview"). The Albion, Bedford Hills, and Taconic facilities house exclusively female inmates. Albion and Lakeview are located

---

[2] Tanya Mitchell-Voyd, the superintendent of Taconic, did not move to dismiss or transfer the claims against her, and filed an answer on May 5, 2021. *See* Dkt. 90.

in the Western District of New York; Taconic and Bedford Hills are located in the Southern District of New York. SAC ¶¶ 9-14.

Plaintiff Jane Stone #1 was incarcerated during the relevant time periods at Albion and Taconic. Plaintiff Jane Stone #2 was incarcerated at Albion. Plaintiff Jane Stone #3 was incarcerated at Taconic. Plaintiff Jane Stone #4 was incarcerated at Lakeview and Taconic. Plaintiff Jane Stone #5 was incarcerated at Bedford Hills, Albion, and Taconic. Plaintiff Jane Stone #6 was incarcerated at Albion. *Id.* ¶¶ 15-21.

Defendant Annucci was at all relevant times the acting commissioner of DOCCS, in which capacity he was "responsible for enacting policies and procedures to protect the safety of inmates incarcerated in DOCCS and ensuring that the policies and practices are enforced in DOCCS facilities." *Id.* ¶¶ 22, 468. Defendant Effman was at all relevant times an associate commissioner for DOCCS and the official designated as DOCCS' Prison Rape Elimination Act ("PREA") coordinator pursuant to 28 C.F.R. § 115.11(b), which requires the agency to employ an upper-level official "with sufficient time and authority to develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities." *Id.* ¶¶ 23, 469. Defendant Squires was at all relevant times the superintendent of Albion; Defendant Kaplan was at all relevant times the superintendent of Bedford Hills; Defendant Kubik was at all relevant times the superintendent of Lakeview. *Id.* ¶¶ 24-26.

Although each Plaintiff experienced sexual abuse at the hands of different prison officers on different occasions between 2015 and 2019, they commonly allege that they were regularly guarded by male officers who were "barely supervised and left alone with women under their control for long periods of times in unmonitored areas of the prisons." *Id.* ¶ 2. The officers also "had a system of warning each other if a supervisor was approaching and created a climate of

fear and intimidation against any woman who complained about sexual attention from an officer." *Id*. Correction officers at the facilities where Plaintiffs were incarcerated frequently "groomed" their victims by spending extensive time speaking to them, allowing them to break prison rules, and gifting them material items such as soap, razor blades, or illegal drugs. *Id*. ¶ 48. Although such grooming can deceive inmates "into believing that such contact is consistent with a normal romantic relationship," *id*., the law recognizes that an inmate cannot consent to sexual activity with an officer, *id*. ¶ 2. *See* N.Y. Penal Law § 130.05(3)(e); *Morris v. Eversley*, 205 F. Supp. 2d 234, 242 (S.D.N.Y. 2002); *Cash v. Cty. of Erie*, 654 F.3d 324, 337 (2d Cir. 2011) ("[A]s a matter of New York state law, *any* sexual contact between a guard and a prisoner"—whether "assaultive" or "non-assaultive"—"is deemed non-consensual due to the inherent power differential between guards and prisoners.").

**Jane Stone #1** was incarcerated at Albion in 2019, where she suffered sexual abuse on the part of Defendant CO James Castonguay. On May 12, Castonguay entered the area where she was taking a shower, with his body camera turned off, and questioned her while she was unclothed. Later that night, Castonguay entered her "cube," pulled out his penis, and instructed her to perform oral sex on him. He then turned her around on her bed and vaginally penetrated her from behind. He told her to get dressed and to go to the laundry room, where he raped her again. Jane Stone #1 called the PREA Hotline to report the incident. In January 2020, Castonguay was indicted for raping her and Jane Stone #6. *See* SAC ¶¶ 194–235.

**Jane Stone #2** was incarcerated at Albion from 2017–2019, where she was continuously subjected to illegal sexual contact by Defendant CO David Stupnick. Stupnick would go out of his way to speak to Jane Stone #2, engaging her in personal conversations. During Stupnick's shifts, he was the only officer assigned to the unit where Jane Stone #2 was housed, and

correction officers on other units would routinely radio ahead to warn other correction officers when supervisory rounds were about to occur. Although Jane Stone #2 was occasionally transferred to different dormitory units, Stupnick continued to spend long periods of time speaking with her and swapped assignments with other officers in order to be able to work in proximity to her. Over the course of many months, from early 2018 to January 2019, Stupnick continuously would take Jane Stone #2 to a cube or a stairwell and engage in illegal sexual contact with her, including by digitally penetrating her vagina. Stupnick met with Jane Stone #2's sister outside of the facility and gave the sister money to be placed in plaintiff's commissary account; he also smuggled personal items for her into the facility and bought her jewelry. By February 2019, Stupnick was entering her cube each night and making her perform oral sex on him. After their relationship was reported to prison authorities, two investigators from the DOCCS Office of Special Investigations ("OSI"), Defendants Investigators Melinda Hanzilian and Alvi Castro, questioned Jane Stone #2 and threatened her with criminal charges and other unspecified consequences if she did not provide information about her relationship with Stupnick. Even as the authorities investigated him, Stupnick continued to work in proximity to Jane Stone #2 and continued to direct her to engage in sexual activity with him. In March 2019, Jane Stone #2 was transferred to Taconic. Stupnick subsequently confessed to sexually assaulting plaintiff and was criminally charged. *See id.* ¶¶ 236-301.

**Jane Stone #3** was transferred to Taconic in May 2018, where she met Defendant CO Pedro Norde while working in the caustics department. Norde frequently swapped shifts to be able to work in the caustics department in order to spend time with Jane Stone #3. He was frequently left alone with her. In July 2018, Norde masturbated and ejaculated in front of Jane Stone #3. On fifteen other occasions, Norde instructed Jane Stone #3 to finish other duties early

and to come visit him in the caustics department, where he would masturbate in front of her. On another occasion in the 81 Basement, when Norde was left alone with Jane Stone #3, he took her to the staff bathroom and orally and vaginally raped her. The camera positioned outside the staff bathroom was not monitored. After learning that Norde had infected her with herpes, she filed a PREA complaint against him. Corrections staff retaliated by conducting additional pat frisks and cell searches on Jane Stone #3. Plaintiffs believe that no disciplinary action has been taken against Norde. *See id.* ¶¶ 302-336.

In January 2017, **Jane Stone #4** arrived at Lakeview, which employs a six-month boot-camp-like program to "shock" inmates into changing their behavior. Defendant CO James Beam took an interest in her and made sure to substitute in for Defendant CO Juan Vasquez, the platoon leader, whenever he could. Beam began confiding in Jane Stone #4 and discussing personal issues with her. Vasquez overheard one such personal conversation, about Beam's girlfriend, and told Jane Stone #4 that this was an inappropriate officer-inmate conversation. Vasquez never reported any of the personal interactions he observed. In July 2017, Beam cornered Jane Stone #4 in the Bubble and tried to kiss her. She wanted to report this but feared doing so due to the lack of confidential reporting channels. The phones at Lakeview are locked and require the involvement of a CO to unlock them; officers generally ask why an inmate wants to use the phone or stands by to overhear the phone conversation. Beam continued on other occasions to try to kiss Jane Stone #4. On July 27, 2017, Jane Stone #4 and another inmate (Jane Sand), who had also been subjected to physical advances from a corrections officer, were told that they were the only two inmates to fail the shock program. They were kept at Lakeview for three more weeks before being transferred. During that time, plaintiff overheard Jane Sand having sex with Defendant CO Matthew Antolini. Antolini pressured Jane Stone #4 to engage in

a sexual relationship with Beam. Beam later cornered Jane Stone #4, forcibly kissed her, and pressed his clothed, erect penis against her body. Beam later brought plaintiff and Jane Sand goods and allowed them to take a lengthy shower. After the shower, Beam directed Jane Stone #4 to have sex with him. She was subsequently transferred to Taconic, where Beam continued to contact her. Beam and Antolini were subsequently criminally prosecuted. *Id.* ¶¶ 337-392.

**Jane Stone #5** was incarcerated at Bedford Hills beginning in 2011. In late 2014 and early 2015, she met Defendant CO Rasheen Smalls, who began to groom her for illegal sexual activity. Defendant CO Naresh Deosarran observed Jane Stone #5's interactions with Smalls and warned her that she was spending too much time talking to him, but he did not report the interactions. Starting in the winter of 2014, Smalls began to sexually exploit Jane Stone #5, including by ordering her into a utility closet that was known to be unmonitored and engaging in sexual acts with her. Smalls was not afraid of being caught by a supervisor because correction officers routinely radioed each other to warn the unit officers when a supervisor was coming. Other officers, including Defendant CO Tiffany Paige and Defendant CO Jose Guzman, knew of Jane Stone #5's relationship with CO Smalls but did not report it to any supervisor or advise her to file a PREA complaint. Jane Stone #5 was transferred to Albion, where at some point investigators confronted her, handcuffed her, and questioned her about her relationship with Smalls, threatening her with consequences for failing to cooperate. Although she was initially fearful to disclose anything about the relationship, she eventually provided investigators with a statement about it, which she was told would be kept confidential. In the winter of 2015, Jane Stone #5 was brought to Taconic and told by DOCCS staff that she had to testify in grand jury proceedings against Smalls. While at Taconic, inmates and correction officers made derogatory comments to her about her relationship with Smalls, and two male officers cornered her and

called her a "snitch." She feared continued retaliation and avoided leaving her cell before being returned to Albion. In the summer of 2016, after her release from prison, she received a subpoena and testified at Smalls's criminal trial, after which Smalls was found guilty of criminal sexual act in the third degree. *See id.* ¶¶ 393-466.

**Jane Stone #6** was housed in the M1 dorm building at Albion from November 2018 to September 2019. After she moved into the dorm, Defendant CO Willie Smith asked her personal questions, peered over her cube wall after she showered, and on several occasions asked her to touch his penis. In those situations, he did not fear being caught because he would receive a phone call from other units warning him of supervisor rounds. Jane Stone #6 sought to transfer out of the dorm to avoid Smith's sexual advances, but her applications were denied. In April 2019, Jane Stone #6 met CO Castonguay who had also begun working in the M1 dorm. One evening, while she was working a shift in the laundry room, Castonguay entered the laundry room, turned off the light, and asked her to perform oral sex on him. He then had sex with her and ejaculated on the laundry room floor. The next evening, Castonguay entered Jane Stone #6's cube in the middle of the night, woke her up, and directed her to masturbate. That month, he sexually abused her on two further occasions in the laundry room. Jane Stone #6 kept a piece of paper and a paper towel containing traces of Castonguay's semen, and eventually turned that evidence over to OSI investigators. On several occasions in May 2019, CO Smith directed Jane Stone #6 to have sex with another inmate while he watched. Jane Stone #6 was also sexually assaulted by Defendant CO Jordan Middlebrooks. From February to September 2019, on more than ten occasions, Middlebrooks entered Jane Stone #6's cube to view and fondle her naked body. Jane Stone #6 did not report Smith, Middlebrooks, or Castonguay through the PREA hotline because she would have had to use her Departmental Identification Number, and feared

that her identity would be revealed. She had learned that Jane Stone #1 had faced retaliation after making a PREA complaint. When Jane Stone #6 eventually told an OSI investigator about the times and dates of the assaults, OSI was unable to recover camera recordings corroborating the attacks. To Plaintiffs' knowledge, no disciplinary action has been taken against CO Middlebrooks or CO Smith. *See id*. ¶¶ 52-193.

Plaintiffs allege that the Supervisory Defendants were responsible for preventing sexual abuse by guards against inmates; on notice of the serious risk of abuse; and failed to enact and enforce policies that would have prevented the abuse. Plaintiffs support their contention that the Supervisory Defendants were aware of the risk of female inmates being sexually abused with the following allegations: (1) statistical reports on prison rape, including a 2018 DOCCS annual report documenting hundreds of complaints of staff sexual abuse, disproportionately at female-only institutions, SAC ¶¶ 481-485, 491-493; (2) the steps taken by several states and local correctional institutions to require the presence of female staff to guard women prisoners, and to remove men from guarding women prisoners in housing areas, *id*. ¶ 490; (3) the fact that Annucci and Effman have themselves been party to a number of lawsuits brought in state and federal courts by imprisoned women who have been the victims of staff sexual abuse, *id*. ¶ 494; and (4) the fact that staff sexual misconduct at DOCCS facilities has resulted in numerous prosecutions, *id*. ¶ 495-496. Plaintiffs further allege that the Supervisory Defendants, through action and inaction, disregarded these risks by keeping in place policies that failed to prevent sexual abuse by male staff against female inmates. In particular, Plaintiffs argue that the following policies or practices caused constitutional violations: (1) permitting the assignment of male staff to posts where they had opportunities for one-on-one unmonitored contact with female inmates, *id*.¶¶ 503-515; (2) failing to enact and enforce adequate rules to ensure that supervisors

would conduct unannounced and unpredictable rounds, *id*. ¶¶ 516-534; (3) failing to maintain sufficient numbers of cameras in facilities and to require that cameras be monitored, *id*. ¶¶ 535-548; (4) allowing officers to switch assignments informally with one another to allow them to choose to be near particular inmates, *id*. ¶¶ 549-554; (5) creating a culture in which warning signs of sexual abuse were ignored and not reported, *id*. ¶¶ 555-575; (6) failing to remove correction officers who developed inappropriate relationships with inmates, *id*. ¶¶ 576-579; (7) allowing a culture of intimidation and fear about reporting sexual abuse, *id*. ¶¶ 580-597; and (8) failing to institute policies that would prevent COs from bringing in contraband to prison facilities in aid of grooming inmates, *id*. ¶¶ 598-602.

## B.  Procedural Background

Plaintiffs filed suit on February 14, 2020. Dkt. 1. On February 18, 2020, Judge Cote, acting in her Part One capacity, granted Plaintiffs permission to proceed anonymously. Dkt. 5. The operative second amended complaint was filed on October 6, 2020. Against the individual correction officers and investigators, the Complaint raises claims including Eighth Amendment claims for cruel and unusual punishment, deliberate indifference to inmate safety, and a failure to protect; and New York law claims for rape, sexual abuse, and battery. As to the Supervisory Defendants, the Complaint charges them with deliberate indifference to the serious risk of inmate sexual abuse, in violation of the Eighth Amendment. The basis for the deliberate indifference claims against Annucci and Effman, the two senior-most DOCCS officials named as defendants, is that they were responsible for inmate safety in DOCCS facilities, aware of sexual abuse by male officers against female inmates at the four facilities, and failed to implement and enforce policies sufficient to protect imprisoned women at the four facilities.

On December 9, 2020, the Supervisory Defendants—represented by the office of the New York Attorney General—filed the instant motion. *See* Dkt. 74. Following the Second Circuit's

decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Court adjusted the briefing schedule to allow the parties to address the impact of that decision—a subject the Court discusses in depth below. The Supervisory Defendants argue that (1) the claims against Annucci and Effman must be dismissed because of the lack of allegations that they were personally involved in any constitutional violations; (2) Jane Stone #5's claims against Superintendent Kaplan must be dismissed as untimely because they accrued more than three years prior to the filing of the complaint; and (3) the claims against Superintendents Squires and Kubik should be either dismissed for improper venue or severed and transferred to the Western District of New York. The Court will address each argument in turn.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (citation omitted). In answering this question, the Court must "accept[ ] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

**DISCUSSION**

I.    **Claims Against Annucci and Effman**

The Supervisory Defendants first argue that the claims against Annucci and Effman must be dismissed because of insufficient allegations that either was directly and personally involved in any constitutional violation, which is a well-established prerequisite for Section 1983 liability. *See* Def. Mem. at 19. They acknowledge that this Court has allowed comparable allegations against Annucci and Effman to proceed past the motion to dismiss stage in another case. *See Pusepa v. Annucci*, No. 17-CV-7954 (RA), 2019 WL 690678 (S.D.N.Y. Feb. 19, 2019). But they argue that the basis for the *Pusepa* decision—that plaintiff had plausibly alleged that Annucci and Effman were liable for her sexual abuse because they created or maintained policies or customs under which unconstitutional practices occurred—is no longer sound law in light of the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). *See* Def. Reply Mem. at 8. Plaintiffs disagree, arguing that the legal framework governing their claims is essentially unchanged after *Tangreti*, and urge the court to hold, as it did in *Pusepa*, that Annucci and Effman can be liable for their creation and maintenance of policies under which Plaintiffs' constitutional rights were violated. *See* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss, Dkt. 86 ("Pl. Mem."). In the Court's view, although Plaintiffs are mistaken in stating that the legal framework it applied in *Pusepa* is entirely unchanged, the Complaint nonetheless succeeds in stating a claim against Annucci and Effman.

The Court begins by reviewing the relevant legal landscape and how the *Tangreti* decision has affected it. It has long been settled law that to state a claim for a government official's liability pursuant to Section 1983, the plaintiff must allege that the defendant was personally involved in the constitutional deprivation at issue. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). The Second Circuit's test for such personal involvement was for many years governed by the factors

set out in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). In that case, the Second Circuit identified five ways in which a plaintiff may establish a supervisory defendant's "personal involvement" in a constitutional violation: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *See Colon*, 58 F.3d at 873.

The Supreme Court's 2009 decision in *Ashcroft v. Iqbal* called the *Colon* factors into some doubt. In holding that claims against the Attorney General and FBI Director for their alleged involvement in an unconstitutional discriminatory scheme were insufficiently pled, the Supreme Court explained that vicarious liability does not apply to *Bivens* and Section 1983 suits, and held that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Supreme Court reemphasized that a government official, "his or her title notwithstanding, is only liable for his or her own misconduct" and rejected the claim that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id*.

The impact of this decision on the *Colon* factors was unclear, and the question divided courts in the Second Circuit. *See Staten v. Semple*, No. 3:18-CV-1251 (VAB), 2021 WL 1060225, at *19 (D. Conn. Mar. 19, 2021) (collecting cases); *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a

supervisor's personal involvement with respect to certain constitutional violations" but declining to resolve the issue). "[T]he majority of courts in this Circuit," however—including this one—"continued to apply the *Colon* factors" after *Iqbal*. *Pusepa*, 2019 WL 690678, at *4 (holding that Annucci and Effman could be liable in connection with a plaintiff-inmate's sexual assault because of their policymaking responsibility under the third *Colon* factor). This Court in *Pusepa* recognized the importance of *Iqbal*'s statement that a Section 1983 plaintiff "must show that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* at *3 (quoting *Iqbal*, 556 U.S. at 678). The Court also recognized that "[w]hen a prison official is sued, 'mere linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.'" *Id.* at *3 (quoting *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003)). But the Court reiterated its view that after *Iqbal*, *Colon* "remain[ed] good law," and applied it to hold Annucci and Effman liable for creating or continuing policies that played a role in bringing about the plaintiff's sexual abuse at the hands of prison staff. *Id.* at *4.

Only recently, in the *Tangreti* case, did the Second Circuit expressly clarify the effect of *Iqbal* on its *Colon* precedent. In that case, the plaintiff alleged, like the plaintiffs here, that she was sexually abused by correction officers in prison. *Tangreti*, 983 F.3d at 612. She brought suit under Section 1983 against eight prison supervisors, including Christine Bachmann, a supervising counselor at the York Correctional Institute who oversaw a substance abuse program, alleging that they violated the Eighth Amendment through their deliberate indifference to the substantial risk of sexual abuse by three corrections officers. The district court denied Bachmann qualified immunity at summary judgment; it found she was "conceivably personally involved" in violations against the plaintiff because she "was grossly negligent in supervising the officers or because she failed to

14

act on information indicating that Tangreti was at substantial risk of sexual abuse." *Id*. at 614-616. *See also Tangreti v. Semple*, No. 3:17-CV-01420 (MPS), 2019 WL 4958053, at *19 (D. Conn. Oct. 8, 2019) (district court opinion) ("Ms. Bachmann was conceivably personally involved in the violations against Ms. Tangreti under [the] fourth *Colon* category . . . or the fifth category.").

The Second Circuit rejected that conclusion and reversed. The Court noted that after *Iqbal*, there can be no "special rule for supervisory liability"—rather, as the Supreme Court made clear, each supervisor must have, through his or her own individual actions, violated the constitution. *Id*. at 612. "The focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (Gorsuch, J.)). Applying that principle, the Court concluded—at the summary judgment phase—that the plaintiff had not adduced sufficient evidence to support an inference that Bachmann, personally and "through her own actions, displayed deliberate indifference to the substantial risk of sexual abuse." *Id*. As the court noted, "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id*. at 616 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Put another way, for a supervisory official to be liable, the official must "personally" know of and disregard "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id*. at 619 (quoting *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020)).

In *Tangreti*, the only evidence that Bachmann subjectively knew of a risk to the plaintiff was that she observed the plaintiff interacting with a correction officer inappropriately on two occasions, but neither time did she observe a sexual interaction. She also heard complaints that the correction officer was "too familiar" with the plaintiff, "but not that they were sexually involved." On the basis of these facts, the Second Circuit concluded, the "most" that could be said is that Bachmann "could have or should have made an inference of the risk of sexual abuse," but there was no evidence that she in fact made such an inference. *Id*. at 619-620. Having established that *Iqbal* precluded the use of a "special test for supervisory liability" under Section 1983, the Circuit held that the mere fact that Bachmann could or should have known of a risk to inmate safety was inadequate, and therefore reversed with instructions to enter summary judgment for Bachmann.

The parties here dispute the state of the law in the wake of *Tangreti*. In particular, they disagree about whether the creation of policies by a supervisory defendant can constitute personal involvement in an underlying constitutional violation sufficient to establish Section 1983 liability. As noted above, whereas Defendants argue that the third *Colon* factor is no longer good law, *see* Def. Reply Mem. at 8, Plaintiffs argue that *Tangreti* "does not change the fundamental framework" governing their claims, *see* Pl. Mem. at 13-14.

At the outset, Plaintiffs' maximalist position—that "personal involvement of supervisors can still be established by the five factors articulated in *Colon*," *id*. at 15—is clearly not correct. Although it is true that *Tangreti* did not expressly state, "We are overruling *Colon*," it made clear that plaintiffs seeking to hold supervisors liable "cannot rely on a separate test of liability specific to supervisors"—i.e., exactly what the five-factor *Colon* test was. *See Tangreti*, 983 F.3d at 619. Going forward, a plaintiff must establish that each defendant's own conduct violated the constitution, and such liability can no longer be solely premised on a defendant's "supervision of

others who committed the violation." *Id*. This clear direction from *Tangreti* plainly abrogates the fourth *Colon* factor, which allowed liability for a defendant who was "grossly negligent in supervising subordinates who committed the wrongful acts." *Colon*, 58 F.3d at 873. The *Tangreti* decision also makes clear that a plaintiff must show that each supervisor himself or herself possessed the requisite *mens rea* to be held liable for the constitutional violation, *e.g.*, in a case like this, that he or she "acted with 'deliberate indifference—meaning that [the defendant] personally knew of and disregarded an excessive risk to [plaintiff's] health or safety." *Tangreti*, 983 F.3d at 619 (citations omitted).

District courts applying *Tangreti* in the months since it was decided have generally stated that the five-factor *Colon* test is no longer good law. *See Reid v. City of New York*, No. 20-CV-644 (GBD) (JLC), 2021 WL 3477243, at *7 (S.D.N.Y. Aug. 6, 2021) ("In *Tangreti*, the Second Circuit overturned its decision in *Colon*."); *Smith v. Westchester Cty.*, No. 19-CV-03605 (NSR), 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (After *Tangreti*, "to hold [an] official liable under Section 1983, in the context of the Fourteenth Amendment, the standards for supervisory liability set out in *Colon* may not be used, and Plaintiff must demonstrate, through factual allegations, that each individual Defendant meets *all* elements required for a Section 1983 conditions of confinement claim"); *Cook v. Dubois*, No. 19-CV-8317 (CS), 2021 WL 91293, at *4 (S.D.N.Y. Jan. 11, 2021) (*Tangreti* "clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid"); *Mazyck v. Keller*, No. 6:20-CV-06055 (EAW), 2021 WL 1201224, at *11 (W.D.N.Y. Mar. 31, 2021) ("[T]he theories of supervisory liability delineated in *Colon* are no longer controlling following the Second Circuit's decision in *Tangreti.*"); *Zielinski v. Annucci*, --- F. Supp. 3d ---, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) ("*Tangreti* . . . recognized the Supreme Court's abrogation of the more plaintiff-friendly test that had long been used by courts in this circuit.");

*Everett v. Dean*, No. 3:20-CV-1260 (GTS) (ML), 2021 WL 3038390, at *6 (N.D.N.Y. June 2, 2021), *report and recommendation adopted*, 2021 WL 3032690 (N.D.N.Y. July 19, 2021), ("District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test"). It is simply not plausible, then, for Plaintiffs to argue that the old *Colon* test survived *Tangreti* in its entirety.

At the same time, however, the Court disagrees with Defendants about the fate of policymaker liability under Section 1983 after *Tangreti*. Although the Second Circuit generally rejected *Colon*, *Tangreti* does not suggest that *Colon*'s third factor—whereby a defendant can be said to be personally involved in a constitutional violation if he "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," 58 F.3d at 873—could never form the basis of an official's liability. The Court reaches this conclusion for several reasons.

First, *Tangreti* did not involve policymaker liability under the third *Colon* factor. The district court there had premised Bachmann's liability on *Colon* factors four and five, prompting the Second Circuit to reverse on the basis that she could not be liable "by reason of [her] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619. An individual who creates a policy or custom whereby the constitution is violated, however, is more directly and personally involved in the constitutional violation than someone who is only negligent in his supervision of the official committing the underlying offense. Holding a policymaker liable for his or her personal handiwork—the creation or maintenance of a policy or custom—is not the same as holding a supervisor vicariously liable for the actions of his subordinates. Indeed, as the Tenth Circuit has noted, "[i]mposing liability upon officials for their promulgation of a policy the enforcement of which violates individuals' federally protected rights holds such officials

'responsible for their own wrongs rather than on the basis of respondeat superior liability' and, therefore, comports with *Iqbal*." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses,* § 7.19[C] (4th ed. 2010)). To be clear, *Tangreti* made clear that the requisite *mens rea* for a supervisor under Section 1983 "can be no less than the *mens rea* required of anyone else." *Id*. at 618; *see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997) (internal quotation marks omitted) ("Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right."). But where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state—in this case, deliberate indifference—the Court is of the view that such official could be deemed to be personally involved in a constitutional violation.

Second, the principle that policymakers can still be liable under Section 1983 after *Iqbal* is consistent with the case law, including post-*Tangreti* district court decisions and the decisions of other Courts of Appeals. To begin with, none of the district court cases cited above that remarked on *Tangreti*'s general abrogation of *Colon* held that Plaintiff can no longer establish a defendant's personal involvement by way of showing that the defendant—acting with the sufficient *mens rea* to constitute deliberate indifference—created an unconstitutional policy. Indeed, some courts post-*Tangreti* appear to have entertained claims on that basis. *See Zielinski*, 2021 WL 2744684, at *7 (noting that it is "true as a general matter" that a defendant could still be held personally responsible for creating an unconstitutional policy, but finding that the summary judgment record was devoid of evidence that the defendant "'personally knew of and disregarded an unreasonable risk of serious harm' to plaintiff's health as a result of his conduct") (quoting *Tangreti*, 983 F.3d at 619). Similarly, in *Abernathy v. Comm'r of Correction*, No. 3:20-CV-00628 (VAB), (D. Conn.

Apr. 2, 2021), Judge Bolden addressed a post-*Tangreti* claim that a prison commissioner and warden could be held liable for their "creat[ion] [of a] policy [of] broken ventilation and procedures implemented for excessive heat" that allegedly caused the plaintiff's injury. *Abernathy*, 2021 WL 1240018, at *6. While seemingly accepting the possibility that creation of an unconstitutional policy could be the basis for liability, the court dismissed claims against the commissioner and warden because the complaint did not provide facts "suggesting … that either the Warden or the Commissioner had subjective knowledge that this [policy] posed a substantial risk of serious harm." *Id*.

Similarly, some of the appellate decisions cited with approval in *Tangreti* recognized that even after *Iqbal*, an official can be held liable under Section 1983 for his or her involvement in the promulgation of an unconstitutional policy. *See Dodds*, 614 F.3d at 1199 (internal quotation marks omitted) ("Whatever else can be said about *Iqbal,* and certainly much can be said, we conclude the following basis of § 1983 liability survived it . . . : § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution."); *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) (agreeing with the Tenth Circuit decision in *Dodds*); *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) ("Beyond [a government official's] own conduct, the extent of his liability as a supervisor is similar to that of a municipality that implements an unconstitutional policy."). A district court decision also cited in *Tangreti* held that while most of the *Colon* factors were invalidated by *Iqbal*, policymaking could still be the basis for a senior official's liability under Section 1983. *See Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801,

2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("*Iqbal*'s 'active conduct' standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal*'s muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.").

Reading *Tangreti* and these other decisions together, the Court concludes that a senior prison official can still be held liable for his role in creating a policy by which violations of the Eighth Amendment occurred, but only if he can be shown to have acted with the necessary *mens rea* of deliberate indifference—that is, only if the pleadings or record evidence "permit the inference that [he] had subjective knowledge of the risk of the sexual abuse inflicted on [plaintiffs] and that [he] decided to disregard that risk." *Tangreti*, 983 F.3d at 619. In this sense, although Plaintiffs' contention that *Colon* in its entirety survives *Tangreti* is certainly wrong, the framework applied by this Court in *Pusepa* is still largely applicable. There, this Court noted that a plaintiff adequately pleads a defendant's involvement in an unconstitutional policy by alleging facts showing "that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm." *Pusepa*, 2019 WL 690678, at *4. To the extent *Tangreti* bears on this framework, it is by making clear that mere "notice" of an unconstitutional practice may be inadequate. After all, "the *mens rea* required of [a supervisor] to be held liable . . . can be no less than the *mens rea* required of anyone else." *Tangreti*, 983 F.3d at 618; *see also id.* at 616 ("[F]or

deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it."). The requisite inference of *mens rea* cannot be established merely by showing that a supervisory defendant "*should have known* of the substantial risk of sexual abuse." *Id.* at 612 (emphasis in *Tangreti*). This language from *Tangreti* suggests that merely being on notice of sexual abuse in prison, or having constructive knowledge thereof, is not necessarily enough—rather, the defendant-official must subjectively know of the risk of sexual abuse and consciously disregard that risk.

The distinction between actual subjective knowledge and mere notice, however, may not be especially significant at the pleadings stage. *Tangreti* was decided at summary judgment, and so it was appropriate for the court to hold plaintiff to her obligation to come forward with record evidence establishing that Bachmann acted with the requisite *mens rea*. The Second Circuit found that on the record before it, "at most it may be said that Bachmann could have or should have made an inference of the risk of sexual abuse." *Tangreti*, 983 F.3d at 619. At summary judgment, this was clearly insufficient under the legal standards articulated by the court. But at the pleadings stage, courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent. As the Second Circuit noted earlier this year, "A complaint is allowed to contain general allegations as to a defendant's knowledge, because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (citations omitted). *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). At the motion to dismiss

stage, a plaintiff is required only "to include allegations of the facts or events they claim give rise to an inference of knowledge." *Kaplan*, 99 F.3d at 864.

Against this backdrop, the Court concludes that the allegations against Annucci and Effman suffice to state a claim that they were personally involved in the creation and maintenance of unconstitutional policies, that they acted with the requisite *mens rea*, and that these policies or customs proximately caused the plaintiffs' injuries.

First, as in *Pusepa*, the Court concludes that Plaintiffs have "plausibly alleged that [Annucci and Effman] bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [DOCCS facilities] to occur." *Pusepa*, 2019 WL 690678, at *5. As the Complaint alleges, Annucci as acting commissioner was at all relevant times responsible for enacting policies governing inmate safety and ensuring that such policies are enforced, and Effman had specific statutory duties under the PREA to "develop, implement, and oversee agency efforts to comply with PREA standards in all its facilities." *See* SAC ¶¶ 467-469. Annucci and Effman also had responsibility for the DOCCS unit charged with investigating allegations of sexual abuse. *Id*. ¶ 50. These facts suffice to allege that Annucci and Effman "had the authority to create or allow the continuance of [DOCCS] policies that led to sexual violence or allowed it to continue." *Pusepa*, 2019 WL 690678, at *5.

Second, the Complaint sufficiently pleads, as required by *Tangreti*, that Annucci and Effman knew of and disregarded a serious risk of sexual abuse in Albion, Lakeview, Bedford Hills, and Taconic, in that the complaint "include[s] allegations of the facts or events [Plaintiffs] claim give rise to an inference of knowledge." *Kaplan*, 999 F.3d at 864. Here, those "facts or events" include: (1) statistical reports on prison rape, including DOCCS reports of which Annucci and Effman were likely aware, SAC ¶¶ 481-485, 491-493; (2) the steps taken by several

states and local correctional institutions to require the presence of female staff to guard women prisoners, and to remove men from guarding women prisoners in housing areas, *id*. ¶ 490; (3) the fact that Annucci and Effman are named defendants in multiple suits in which imprisoned women have brought claims of being sexually abused by staff in DOCCS facilities, *id*. ¶ 494; and (4) the fact that staff sexual misconduct at DOCCS facilities has resulted in numerous prosecutions and convictions of correction officers, *id*. ¶ 495-496. The Court thus concludes, as it did in *Pusepa*, that "it is plausible that this evidence of sexual abuse . . . would have put the Supervisory Defendants on notice that existing policies . . . were deficient." 2019 WL 690678, at *7.

One caveat is worth emphasizing: going forward past the pleadings stage, merely showing that defendants were on notice of previous instances of sexual abuse will not necessarily be enough to establish their liability. *Cf. Brown v. Dep't of Corr.*, No. 3:16-CV-00376 (WIG), 2021 WL 124417, at *17 (D. Conn. Jan. 13, 2021) (granting summary judgment to defendants where the record evidence did "not support the inference that Defendants . . . had the required subjective knowledge that Plaintiff was at a substantial risk of serious harm."). As *Tangreti* makes clear, a prison official charged with deliberate indifference must both (1) be aware of facts from which the inference could be drawn that there was a substantial risk of serious harm to inmates; and (2) actually draw that inference. *Tangreti*, 983 F.3d at 619. At summary judgment, Plaintiffs will no longer benefit from Rule 9(b)'s recognition that knowledge and intent can be alleged generally. But for now, the allegations, viewed in the light most favorable to Plaintiffs, give rise to a reasonable inference that Annucci and Effman subjectively knew of a serious risk of sexual abuse of female inmates by staff in DOCCS facilities that was not being adequately addressed by the existing policies or the way they were being enforced.

Finally, the Court finds that Plaintiffs have adequately described a series of policies, customs, or enforcement practices within Annucci and Effman's areas of responsibility that are linked to the sexual abuse allegedly suffered by Plaintiffs. For example, the allegation that male staff were permitted regular, unmonitored one-on-one access to female inmates is plausibly alleged to have proximately caused the sexual abuse of Jane Stone #1 at the hands of CO Castonguay, Jane Stone #2 at the hands of CO Stupnick, Jane Stone #3 at the hands of CO Norde, Jane Stone #4 at the hands of CO Beam, Jane Stone #5 at the hands of CO Smalls, and Jane Stone #6 at the hands of COs Smith, Middlebrooks, and Castonguay. *See* SAC ¶¶ 509-515. Another policy or practice, the lack of unpredictable and unannounced supervisor rounds, is plausibly alleged to have allowed correction officers to engage in illegal sexual activity without fear of getting caught. *See id*. ¶¶ 516-534; *id*. ¶ 244 ("During CO Stupnick's shift, correction officers on other units would routinely radio ahead to warn other correction officers when supervisory rounds were about to occur."); *id*. ¶ 61 ("CO Smith was not afraid that he would get caught [abusing Jane Stone #6] because he would get a phone call from the other units warning him that a supervisor was about to make rounds."). Similarly, the inadequate placement and monitoring of cameras is plausibly alleged to have allowed the correction officer defendants to engage in sexual abuse without fear of being discovered. *See id*. ¶¶ 535-548; *id*. ¶ 330 (the camera outside the staff bathroom at Taconic, where Jane Stone #3 was raped, was not monitored). The policy or custom of allowing correction officers to swap assignments with each other informally is plausibly alleged to have allowed officers to seek out particular inmates for abuse. *See id*. ¶¶ 549-554; *id*. ¶ 257 (CO Stupnick regularly swapped his bids in order to work in proximity to Jane Stone #2); *id*. ¶ 306 (CO Norde regularly swapped bids to spend more time with Jane Stone #3). Moreover, failing to require more rigorous screening of what officers

brought into the facilities is plausibly alleged to have allowed them to coerce Plaintiffs into engaging in sexual activity by providing them with contraband. *See id.* ¶¶ 598-602; *id.* ¶ 379 (CO Beam brought Jane Stone #4 shampoo). "Although any one of these examples alone may be insufficient to state a cause of action, together they plausibly connect the Supervisory Defendants' policies to a reasonably foreseeable consequence": the sexual abuse of the plaintiffs. *Pusepa*, 2019 WL 690678, at *8.

For these reasons, the Court concludes that Plaintiffs have succeeded in stating a claim that Annucci and Effman were personally involved in the constitutional deprivations they suffered by enacting or failing to enact policies and practices that resulted in a violation of their rights. Although Plaintiffs will face a greater evidentiary burden as this case proceeds to establish that Annucci and Effman acted with the requisite deliberate indifference, the allegations are at this stage sufficient. Defendants also seek to establish that Annucci and Effman are qualifiedly immune. But as discussed above, Plaintiffs have pled facts that could conceivably establish their liability, and it has long been clearly established that a prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Constitution. *See Farmer*, 511 U.S. at 828. As in *Pusepa*, which acknowledged that qualified immunity is typically a fact-specific defense addressed at summary judgment, the Court finds that "[w]hether Defendants in fact acted in conformity with their constitutional obligations cannot be decided on the basis of the pleadings." *Pusepa*, 2019 WL 690678, at *17. Annucci and Effman are accordingly not entitled to qualified immunity at this time.

## II.   Claims Against Superintendent Kaplan

The Supervisory Defendants also move to dismiss Jane Stone #5's claims against Sabina Kaplan, the superintendent of Bedford Hills, as untimely. The Complaint alleges that Jane Stone

#5 was sexually assaulted by CO Smalls at Bedford Hills in 2014 and 2015, and that she remained in prison until the summer of 2016, but the action was not filed until February 2020. Defendants accordingly argue that, whether Jane Stone #5's claims accrued from the time of the sexual abuse or upon her release from prison, they were not brought within the applicable three-year limitations period. *See Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Section 1983 actions filed in New York are . . . subject to a three-year statute of limitations."). Plaintiffs appear to agree that the statute of limitations has lapsed, but argue that "extraordinary circumstances" justify the equitable tolling of the statute of limitations. *See* Pl. Mem. at 2 (quoting *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005)). The Court agrees with Defendants that Jane Stone #5's claims must be dismissed as untimely.

Courts in this Circuit apply the doctrine of equitable tolling "only in 'rare and exceptional circumstances,' where . . . 'extraordinary circumstances' prevented a party from timely performing a required act, and [where] the party acted with reasonable diligence throughout the period he [sought] to toll." *Jastremski*, 430 F.3d at 564 (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)). "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). Here, the basis advanced by Plaintiffs for equitable tolling is that Jane Stone #5 was prevented from coming forward sooner. At the time she experienced the alleged abuse, she was an inmate in the custody of Bedford Hills, where Defendant Kaplan was the superintendent. Plaintiffs point to the Complaint's allegations that Jane Stone #5 did not feel safe reporting her sexual abuse, that she worried about retaliation, and that she specifically feared that if she complained while still in prison she could be subject to retaliation that could have delayed her release date. Pl. Mem. at 3 (citing SAC ¶¶

444, 498). She further alleges that when she was made to testify before a grand jury about CO Smalls's conduct, she faced bullying from both inmates and correction officers at Taconic. *See* SAC ¶¶ 451–453.

In *Davis v. Jackson*, a 2016 case involving an inmate who argued that his fear of retaliation prevented him from timely filing his claims, Judge Karas explained that in many scenarios, such as the employment discrimination context, "fear of retaliation is not a valid ground for equitable tolling." *Davis v. Jackson*, No. 15-CV-5359 (KMK), 2016 WL 5720811, at *9 (S.D.N.Y. Sept. 30, 2016) (collecting Title VII and ADA cases). Judge Karas persuasively concluded, however, that a different result is warranted in the prison context. Because of "the substantial control that correction officers exert over inmates[,] . . . inmates may show extraordinary circumstances for purposes of equitable tolling where they allege specific facts showing that a reasonable fear of retaliation prevented them from filing a timely complaint." *Davis*, 2016 WL 5720811, at *11.

The Court accepts as true the allegations that Jane Stone #5 had legitimate and specific reasons to fear coming forward with her claims of sexual abuse while she was incarcerated. *See id.* (internal citations and quotation marks omitted) (because "a correctional officer controls an inmate's life inside of prison, . . . the specter of retaliation [is] a real and ever-present force in an inmate's life"). The problem with Plaintiffs' argument, however, is that Jane Stone #5 was released from prison in 2016, SAC ¶ 460, when her claim would still have been timely. At that point, she was no longer under the "substantial control" of the defendant correction officers and supervisory officials, and accordingly no longer subject to the "unique psychological environment" of incarceration that supported Judge Karas's conclusions in *Davis*. *See* 2016 WL 5720811, at *10. The Court does not doubt that the trauma of sexual abuse, particularly by one's

jailors, can and often does persist for many years. *Cf.* SAC ¶ 235 (describing Jane Stone #1's ongoing depression and PTSD). But under existing law, a plaintiff's experience of trauma, even significant trauma, cannot on its own legally justify the potentially indefinite tolling of a statute of limitations. To the extent Jane Stone #5's fear of retaliation in prison equitably tolled the statute of limitations while she was incarcerated, she would nonetheless "bear[] the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling . . . claim have ceased to be operational." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (internal quotation marks omitted).

Even if fear of retaliation could be the basis for equitable tolling *after* an inmate's release, Plaintiffs do not allege facts establishing that Jane Stone #5 continued to have a specific and credible basis to fear retaliation once she was released from prison in the summer of 2016. *See Pratt v. Stop & Shop Supermarket Co., LLC*, No. 09-5417 (JFB), 2011 WL 579152, at *5 (E.D.N.Y. Feb. 9, 2011) ("Assuming arguendo that equitable tolling can be based on a reasonable fear of retaliation, plaintiffs generalized allegations of fear are insufficient to warrant equitable tolling.") (citing *Olson v. Fed. Mine Safety & Health Review Comm'n*, 381 F.3d 1007, 1014-15 (10th Cir. 2004)). Plaintiffs' opposition memorandum argues that Jane Stone #5 was, at the time of the filing of this action, "still on parole and . . . afraid that officials [would] fabricate a way to violate her so that she returns to prison." Pl. Mem. at 4 (citing SAC ¶¶ 464-466). But the cited paragraphs of the Complaint do not provide the required support for that assertion; instead they note that Jane Stone #5's supervised release status "could [have been] revoked, and she could [have been] returned to DOCCS custody," SAC ¶ 465, as well as that she feared that "*if* she were returned to DOCCS custody, she would face retaliation," *id.* ¶ 466 (emphasis added). The mere possibility of being found to have violated supervised release and being

returned to prison does not, in the Court's view, amount to an extraordinary circumstance justifying equitable tolling. The Complaint also does not provide factual support for Plaintiffs' assertion in their opposition memorandum that Jane Stone #5 had reason to believe that, had she raised her Section 1983 claims in a timely fashion, state actors would have fabricated a way to find her in violation of supervised release and brought her back into DOCCS custody where she would be subject to further retaliation. The Court accordingly agrees with Defendants that Jane Stone #5 was not "prevented . . . from timely performing a required act," *Jastremski*, 430 F.3d at 564, and therefore that she cannot rely on equitable tolling to salvage her untimely claim. The claims against Defendant Kaplan are accordingly dismissed. For the same reasons, the Court *sua sponte* dismisses as untimely Jane Stone #5's claims against Annucci and Effman as well as the other officers alleged to have been directly responsible for or deliberately indifferent to her 2014 and 2015 sexual abuse: Defendant CO Smalls, Defendant CO Guzman, Defendant CO Paige, and Defendant CO Deosarran.

## III.    Venue

The Supervisory Defendants further argue that the claims against Superintendents Squires (Albion) and Kubik (Lakeview) are not properly venued in the Southern District of New York ("SDNY"), since the claims did not arise in substantial part in this District and are based on events taking place in the Western District of New York ("WDNY"). Defendants argue that the claims should be dismissed pursuant to Rule 12(b)(3) for improper venue, or in the alternative that they should be severed and transferred to the WDNY.

The Court agrees with the Supervisory Defendants that venue is not proper in this District for the claims against Defendants Squires and Kubik. Pursuant to 28 U.S.C. § 1391(b), a civil action may be brought in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). Where a plaintiff asserts multiple claims, "venue must be proper as to each of the claims asserted, but a common factual basis between a claim where venue is proper and one where venue is improper may defeat dismissal of a claim for improper venue." *Cartier v. Micha, Inc.*, No. 06-CV-4699, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007) (citing *E.P.A. ex rel. McKeown v. Port Auth. of N.Y. & N.J.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001)). When the claims involve multiple different parties, however, "venue must be proper . . . as to each party," and "[t]he fact that a claim for some of the plaintiffs or against some of the defendants arose in a particular district does not make that district a proper venue for parties as to whom the claim arose somewhere else." Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3807 (4th ed.). *See also Walker v. U.S. Dep't of Com.*, No. 1:11-CV-01195 (AWI), 2012 WL 1424495, at *1 (E.D. Cal. Apr. 24, 2012) ("When there are multiple parties and/or multiple claims in an action, the plaintiff must establish that venue is proper as to each defendant and as to each claim.").

Here, only Plaintiffs Jane Stone #1, Jane Stone #2, and Jane Stone #6 assert claims against Squires, the superintendent while they were incarcerated at Albion. *See* SAC ¶¶ 735-744. Only Plaintiff Jane Stone #4 asserts claims against Kubik, the superintendent while she was incarcerated at Lakeview. *See id.* ¶¶ 753-760. Both Albion and Lakeview are located in the WDNY. Thus for none of these claims did "a substantial part of the events or omissions giving rise to the claim occur[]" in the SDNY. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005); SAC

31

¶¶ 15-21.[3] Moreover, neither the plaintiffs bringing these claims nor the defendants reside in the SDNY. *See* Def. Mem. at 15 (noting that Jane Stone #1 resides in the NDNY, Jane Stone #2 resides in the WDNY, Jane Stone #4 resides in the EDNY, and Jane Stone #6 resides in the WDNY; Kubik and Squires both work and reside in the WDNY.) For these reasons, the claims of Jane Stone #1, Jane Stone #2, and Jane Stone #6 against Squires, and the claims of Jane Stone #4 against Kubik, are not properly venued in this District.

In resisting this conclusion, Plaintiffs appear to conflate two distinct questions, namely (1) whether venue for these claims is proper and (2) whether the parties and claims were properly joined pursuant to the Federal Rules of Civil Procedure. In arguing against dismissal of the claims against Squires and Kubik, Plaintiffs never actually defend the propriety of venue for those claims, instead arguing that the claims were properly *joined*. *See* Pl. Mem. at 6-7. Plaintiffs point to Fed. R. Civ. P. 20(a)(2)'s statement that multiple defendants may be joined in a single action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Plaintiffs maintain that because the claims brought by all plaintiffs against Annucci and Effman are indisputably properly venued in the SDNY, and because those claims share common questions of fact and law with the claims against Squires and Kubik, the claims against Squires and Kubik are "properly joined in this action." Pl. Mem. at 6-7. But even assuming that all parties

---

[3] Although Jane Stone #4, who was allegedly sexually abused by CO Beam at Lakeview (in the WDNY), was later transferred to Taconic (in the SDNY), and although CO Beam continued to send letters to Jane Stone #4 at Taconic, there is no allegation in the Complaint that Kubik had any reason to know of such contact. In any event, the mere fact that an officer from Lakeview sent letters to Jane Stone #4 at Taconic is insufficient to establish that "a *substantial* part of [the] acts or omissions" giving rise to Jane Stone #4's claims against Kubik occurred at Taconic in the SDNY. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (emphasis added). *See also Blakely v. Lew*, 607 F. App'x 15, 17 (2d Cir. 2015) (quoting *Gulf Ins. Co.*, 417 F.3d at 357) ("In performing [venue] analysis, courts must 'take seriously the adjective 'substantial'' and 'construe the venue statute strictly.'")

were properly joined in this action pursuant to the Federal Rules of Civil Procedure, and recognizing that there are common questions of law and fact to the claims against all the Supervisory Defendants, that does not mean that venue was proper as to each party. *See* Fed. R. Civ. P. 82 (the Federal Rules of Civil Procedure "do not extend or limit the jurisdiction of the district courts or the venue of actions in those courts."); *Locke Mfg. Co. v. Sabel*, 244 F. Supp. 829, 830–31 (W.D. Ky. 1965) ("Rule 82 . . . means that where due to a failure of venue an action could not by itself have been brought in a particular federal court, neither can it be brought by reason of joinder with another claim."). Plaintiffs have accordingly failed to establish that the claims against Kubik and Squires can properly be maintained in this District.

Pursuant to 28 U.S.C. § 1406(a), when an action has not been brought in an appropriate venue, a district court may either dismiss the claim "or if it be in the interest of justice, transfer [it] to any district or division in which it could have been brought." *Gonzalez v. Hasty*, 651 F.3d 318, 324 (2d Cir. 2011). "The district court's decision whether to dismiss or transfer a case 'lies within the sound discretion of the district court.'" *Blakely v. Lew*, 607 F. App'x 15, 18 (2d Cir. 2015) (quoting *Minnette v. Time Warner,* 997 F.2d 1023, 1026 (2d Cir.1993)). "A 'compelling reason' for transfer is generally acknowledged when a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005) (quoting *Phillips v. Seiter*, 173 F.3d 609, 610 (7th Cir. 1999)). In this case, the Court opts to transfer the claims against Squires and Kubik to WDNY rather than dismiss them. The Court has no reason to conclude that the claims are a "sure loser," *Moreno–Bravo v. Gonzales,* 463 F.3d 253, 263 (2d Cir.2006), and further finds that Plaintiffs could be prejudiced by dismissal instead of transfer. For example, Jane Stone #4's alleged abuse at the hands of CO Beam occurred in 2017, which means that her claims arguably would be time-

barred upon refiling in the WDNY. *See* SAC ¶¶ 337-392. Accordingly, as detailed in the following paragraph, the claims against Squires and Kubik are to be severed pursuant to Fed. R. Civ. P. 21 and transferred pursuant to 28 U.S.C. § 1406(a).

Furthermore, in the interests of justice and judicial economy, the Court is inclined to sever and transfer to the WDNY not merely the claims against Squires and Kubik but all the claims of Plaintiffs Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6. *See Delgado v. Villanueva*, No. 12 CIV. 3113 (JMF), 2013 WL 3009649, at *3 (S.D.N.Y. June 18, 2013) (cleaned up) ("A court may transfer a case *sua sponte* where such transfer would be for the convenience of parties and witnesses, and in the interest of justice, so long as the case is transferred to another district or division where it might have been brought."). Those additional claims would include the claims of Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6 against the correction officers at Albion and Lakeview, DOCCS investigators Hanzlian and Castro, and Commissioners Annucci and Effman. Were the Court to sever and transfer those claims alongside the claims against Squires and Kubik, the only claims remaining in the SDNY action would be the claims asserted by Jane Stone #3 (the Court having dismissed as untimely the claims asserted by Jane Stone #5). "[O]rdinarily," however, "'a court may *sua sponte* transfer an action under 28 U.S.C. § 1404(a)' only 'after giving both parties notice and an opportunity to be heard." *Id*. at *4, n.3 (quoting *Bona v. Barasch*, No. 01 Civ. 2289 (MBM), 2003 WL 1395932, at *36 (S.D.N.Y. Mar. 20, 2003)). Accordingly, within thirty days of the date of this order, the parties are directed to confer and notify the Court whether they consent to the transfer of all of the claims of Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6 to the WDNY, and if not, to explain why doing so would not serve the interests of justice and judicial economy (keeping in mind that the claims against Kubik and Spires will be transferred). Until

the parties make such submission, the Court will refrain from directing the Clerk of Court to transfer out the claims against Kubik and Squires such that, in the event that the parties agree or that the Court opts to transfer other claims, it can effectuate such transfer in a single order.

## CONCLUSION

For the foregoing reasons, the Supervisory Defendants' motion is denied in part and granted in part, as follows: (1) the motion to dismiss all Plaintiffs' claims against Defendants Annucci and Effman is denied; (2) the motion to dismiss as untimely Jane Stone #5's claims against Defendant Kaplan is granted, and the Court further *sua sponte* dismisses Jane Stone #5's other claims; and (3) Defendants' motion to sever and transfer to the WDNY the claims against Squires and Kubik is granted. As noted above, before effectuating such severance and transfer, the Court will give the parties an opportunity to be heard on whether the other claims of Plaintiffs Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6 should similarly be severed and transferred to the WDNY, and such submissions are due within thirty days of the date of this order. The Supervisory Defendants' deadline to answer the complaint is stayed pending resolution of which claims will be transferred and which claims will remain part of the SDNY action.

The Clerk of Court is respectfully directed to (1) terminate Defendants Kaplan, Smalls, Guzman, Paige, and Deosarran; and (2) close the motion pending at Dkt. 74.

SO ORDERED.

Dated:    September 28, 2021
          New York, New York

Ronnie Abrams
United States District Judge