UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JANE STONE #1, *et al.*,

        Plaintiffs,

        v.                                    21-CV-1191-LJV-LGF
                                                DECISION & ORDER

BRIAN KUBIK, *et al.*,

        Defendants.
_____

The plaintiffs in this case—proceeding anonymously as Jane Stone #1, Jane Stone #2, Jane Stone #4, and Jane Stone #6—are four women who are or were incarcerated at four New York State Department of Corrections and Community Supervision ("DOCCS") correctional facilities. *See* Docket Item 56 (second amended complaint).[1] They allege that they were sexually abused by DOCCS correction officers while they were incarcerated and that DOCCS supervisors and investigators failed to prevent that abuse. *See id.* And they bring Eighth Amendment claims under 42 U.S.C. § 1983 as well as statutory and common law claims under New York State law. *See id.*

On March 21, 2022, defendants Alvi Castro and Melinda Hanzlian, two investigators in the DOCCS Office of Special Investigations ("OSI"), moved to dismiss plaintiff Jane Stone #2's Eighth Amendment claim against them. Docket Item 104. On

---

[1] On February 14, 2020, five plaintiffs commenced this case in the United States District Court for the Southern District of New York, Docket Item 1, and on July 15, 2020, the plaintiffs filed an amended complaint that included claims brought by a sixth plaintiff, Stone #6, Docket Item 30. On November 3, 2021, the Southern District transferred most of Stone #1's, Stone #2's, Stone #4's, and Stone #6's claims to this Court. *See* Docket Item 95.

April 20, 2022, Stone #2 responded to that motion, Docket Item 112, and on April 29, 2022, Castro and Hanzlian replied, Docket Item 115.

On April 3, 2023, Stone #2 moved for a default judgment against David Stupnick, the correction officer who she alleges sexually abused her. Docket Item 135. Stupnick has not responded to that motion, and the time to do so has expired. *See* Docket Item 137.

For the reasons that follow, Castro's and Hanzlian's motion to dismiss is denied, and Stone #2's motion for a default judgment is granted in part.

## **FACTUAL BACKGROUND**[2]

In June 2017, Stone #2 was incarcerated at the Albion Correctional Facility ("Albion"). Docket Item 56 at ¶ 236. She first encountered Stupnick, a correction officer at Albion, around that time. *See id.* Over the next twenty-some months, Stupnick pursued Stone #2 at Albion and eventually sexually abused her on a nightly basis. *See id.* at ¶¶ 236-75.

Sometime around August 2017, Stone #2 "was transferred to the 'I1' dorm building." *Id.* at ¶ 238. At that time, Stupnick worked the "7:00 a.m. to 3:00 p.m. shift" at that dorm. *Id.* at ¶¶ 239-40. In fact, Stupnick "was the only officer assigned to the unit during his shift." *Id.* at ¶ 241. After Stone #2 was moved to the I1 dorm, Stupnick

---

[2] The following facts are taken from the second amended complaint, Docket Item 56. On a motion to dismiss under Rule 12(b)(6), the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). Likewise, on a motion for a default judgment, "the factual allegations of the complaint are taken as true." *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015).

2

"spent long periods of time during the day engaging [her] in personal conversations." *Id.* at ¶ 243.

Stone #2 then was moved to the J2 dorm sometime around November 2017. *Id.* at ¶ 246. Although Stupnick was not assigned to work in the J2 dorm at that time, he worked the 3:00 p.m. to 11:00 p.m. shift in the adjacent J1 dorm. *Id.* at ¶¶ 247-48. The two dorms "were connected by a locked door that the correction officers could access with a key." *Id.* at ¶ 248. After Stone #2's transfer to J2, Stupnick "continued to meet with [her] and spent long periods of time speaking with her at the officer's desk." *Id.* at ¶ 249. Sometime around December 2017, Stupnick "kissed [] Stone #2 on the lips inside another inmate's cube in the J1 dorm." *Id.* at ¶ 250.

In early 2018, Stone #2 transferred dorms again, this time to "the Mess Hall Dorm." *Id.* at ¶ 251. Shortly after Stone #2 transferred there, Stupnick "swapped bids to work in her unit." *Id.* at ¶ 252. And sometime after he began working in the Mess Hall Dorm, Stupnick kissed and digitally penetrated Stone #2. *Id.* at ¶¶ 252-55.

A few months later, that pattern recurred: Stone #2 again transferred dorms, and Stupnick again "swapp[ed] his bids in order to work" the afternoon and night shift in Stone #2's new dorm. *Id.* at ¶¶ 256-57. Each time Stupnick worked that shift, he "would take [] Stone #2 to a cube and digitally penetrate her vagina." *Id.* at ¶ 258. Stupnick also began sending Stone #2 "intimate letters that were often sexual in nature." *Id.* at ¶ 260.

In August 2018, Stone #2 was moved to another dorm—one where Stupnick worked twice a week. *Id.* at ¶¶ 261-62. After that move, Stupnick "engaged in illegal sexual conduct with [] Stone #2 in a cube or on the stairs leading up to the officer's desk

3

every time he worked at [the dorm]." *Id.* at ¶ 263.  At some point, Stupnick told Stone #2 "that other correction officers were advising him to give up his bid or to transfer to another facility because DOCCS staff were talking about the relationship."  *Id.* at ¶ 267.

Toward the end of 2018, Stupnick "began meeting [] Stone #2's sister outside [] the facility."  *Id.* at ¶ 268.  Stupnick gave Stone #2's sister "approximately $100 a week to put into [] Stone #2's commissary account."[3]  *Id.* at ¶ 269.  Stupnick also smuggled items into Albion to give to Stone #2, including cigarettes, nail polish, makeup, and a diamond heart-shaped necklace.  *Id.* at ¶¶ 269-72.  Stone #2 says that at some point, OSI recovered the diamond necklace.  *Id.* at ¶ 273.

In early 2019, Stone #2 transferred dorms to another one of Stupnick's "regular posts."  *Id.* at ¶ 274.  The abuse continued there, and by February 2019, Stupnick was "enter[ing] [] Stone #2's cube each night [to] ma[ke her] perform oral sex on him."  *Id.* at ¶ 275.

That month, another inmate in the dorm reported the "relationship" between Stupnick and Stone #2.  *Id.* at ¶ 276.  OSI investigators Castro and Hanzlian then summoned Stone #2 to the Albion administration building and asked her about her "relationship" with Stupnick.  *Id.* at ¶¶ 277-78.  Castro and Hanzlian told Stone #2 "that she had to talk, or they could charge her with felonies for receiving contraband."  *Id.* at ¶ 279.  But Stone #2 "refused to speak to the investigators."  *Id.*

Over the next few days, Castro and Hanzlian summoned "dozens of [other] inmates to [the Albion administration building] to ask about the relationship between"

---

[3] "'Commissary' refers to a financial account that inmates are permitted to use to buy basic items in prison . . . ."  Docket Item 56 at ¶ 41.

4

Stupnick and Stone #2.  *Id.* at ¶ 283.  Stone #2 says that Stupnick's sexual abuse "was corroborated through those interviews."  *Id.* at ¶ 284.  While that investigation was ongoing, however, Stupnick continued to work shifts in Stone #2's dorm.  *Id.* at ¶ 285.  And Stupnick continued to sexually abuse Stone #2 during that time, "direct[ing her] to perform oral sex on him at least three more times."  *Id.* at ¶ 286.

At the end of the month, Stone #2 met with Hanzlian and another OSI investigator.  *Id.* at ¶ 287.  The investigators "asked her again about the relationship with [] Stupnick and told her that she had to talk" or else "things 'would only get worse from here.'"  *Id.* at ¶ 288.  The investigators also told her that someone had "searched her cell," that they "had DNA evidence," and that they "had dozens of statements from other inmates about the relationship."  *Id.* at ¶¶ 289-90.  Stone #2, however, still "feared that she would be punished for her own victimization" and "wrote a statement denying the relationship."  *Id.* at ¶¶ 291-92.

Later that day, Stone #2 was moved from her dorm and Stupnick was informed that "he could not return to Albion."  *Id.* at ¶¶ 293-94.  In May 2019, Stupnick confessed to sexually abusing Stone #2 and another inmate at Albion.  *Id.* at ¶ 296.  Stupnick then was charged with four counts of second-degree sexual abuse, two counts of third-degree criminal sexual acts, and two counts of official misconduct.  *Id.* at ¶ 297.  Eventually, Stone #2, who at that point had been transferred to the Taconic Correctional Facility, "provided a full statement about the relationship between herself and [] Stupnick."  *Id.* at ¶ 298.

## LEGAL PRINCIPLES

I.     **MOTION TO DISMISS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that tenet 'is inapplicable to legal conclusions,' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

II.     **MOTION FOR DEFAULT JUDGMENT**

"Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "Rule 55 provides a 'two-step process' for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)). "[A] defendant who defaults thereby admits all 'well-pleaded' factual allegations

6

contained in the complaint." *Id.* at 137 (citing *Vt. Teddy Bear*, 373 F.3d at 246).  But "it is also true that a district court 'need not agree that the alleged facts constitute a valid cause of action,'" and the Second Circuit has "suggested that, prior to entering default judgment, a district court is 'required to determine whether the plaintiff's allegations establish the defendant's liability as a matter of law.'"  *Id.* (alterations omitted) (first quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); then quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)).

## DISCUSSION

### I.     MOTION TO DISMISS

Stone #2 says that Castro and Hanzlian violated her Eighth Amendment rights when they failed to separate Stupnick from her during their investigation, thus enabling Stupnick to sexually abuse her even after the investigators knew about the repeated abuse.  Docket Item 56 at ¶¶ 690-94.  "To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to [her] current or future health, and (b) that the defendant acted with 'deliberate indifference.'"  *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "Deliberate indifference under the Eighth Amendment standard means the official must 'know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.'"  *Id.* (alterations omitted) (quoting *Farmer*, 511 U.S. at 837).

For the purposes of their motion to dismiss, Castro and Hanzlian do not dispute that Stone #2 has sufficiently alleged an objectively serious risk of harm—namely, Stupnick's sexual abuse. Docket Item 104-1 at 5 n.2. Instead, Castro and Hanzlian say that Stone #2's Eighth Amendment claim fails because she has not plausibly alleged that either of them acted with deliberate indifference to that objectively serious harm. *See id.* at 6. That is, Castro and Hanzlian maintain that they "did not 'perceive' a risk of ongoing harm to [] Stone #2 and then disregard it" when they failed to separate Stone #2 from Stupnick because they were still investigating the allegations of sexual abuse— allegations that they say could not be corroborated earlier because Stone #2 herself did not confirm them. *See id.* at 3.

As already noted, an Eighth Amendment claim based on the failure to prevent sexual abuse of a prisoner requires that the defendant act with deliberate indifference. In other words, it is not enough that the defendant "could have or should have made an inference of the risk of sexual abuse," *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020); instead, "the defendant[] must subjectively know of the risk of sexual abuse and consciously disregard that risk," *Stone #1 v. Annucci*, 2021 WL 4463033, at *9 (S.D.N.Y. Sept. 28, 2021). At the same time, "courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward" at the pleadings stage "with direct evidence of a defendant's subjective or actual knowledge or [] intent." *Id.* at *10. A plaintiff therefore may rely on "general allegations as to a defendant's knowledge" in her complaint provided she "include[s] allegations of the facts or events [she] claim[s] give rise to an inference of knowledge." *Id.* (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021)).

8

With that backdrop, this Court concludes that Stone #2 has plausibly alleged that Castro and Hanzlian acted with deliberate indifference to the risk of ongoing sexual abuse by Stupnick.  Stone #2 says that Castro and Hanzlian, spurred by a report from another inmate at Albion, began an investigation in late February 2019 into Stone #2's "relationship" with Stupnick.  Docket Item 56 at ¶¶ 276-78.  She alleges that Castro and Hanzlian were aware that Stone #2 had "receiv[ed] contraband" in Albion, and because Castro and Hanzlian asked about that contraband when they questioned Stone #2 about her "relationship" with Stupnick, she infers that they also must have linked that contraband to Stupnick.  *Id.* at ¶¶ 278-79; *see also* Docket Item 112 at 9.  Stone #2 acknowledges that she "refused to speak to" Castro and Hanzlian during the first interview.  Docket Item 56 at ¶ 280.  But she also alleges that "over the next few days," Castro and Hanzlian confirmed that Stupnick was sexually abusing Stone #2 based on interviews with "dozens of inmates."  *Id.* at ¶¶ 283-84.

So while Stone #2 concedes that *she* did not confirm the allegations of sexual abuse during her first interview with Castro and Hanzlian, she alleges that Castro and Hanzlian corroborated those allegations—and therefore knew about Stupnick's sexual abuse—just a few days later.  *Id.* at ¶¶ 280-84.  But Castro and Hanzlian did not then separate Stupnick from Stone #2; instead, Stupnick continued to work in Stone #2's dorm.  *Id.* at ¶ 285.  And over the course of those two weeks between Stone #2's initial interview and Stupnick's dismissal, Stupnick "directed [] Stone #2 to perform oral sex on him at least three more times."  *Id.* at ¶ 286.  In other words, Stone #2 alleges that Castro and Hanzlian confirmed shortly after their initial interview with Stone #2 that Stupnick was sexually abusing her but effectively allowed Stupnick to continue to do so

9

by not separating him from Stone #2.  That is enough to allege that Castro and Hanzlian "kn[ew] of the risk of sexual abuse" by Stupnick but "consciously disregard[ed] that risk." *Stone #1*, 2021 WL 4463033, at *9.

Castro and Hanzlian ask this Court to infer that they could not have been deliberately indifferent to the risk of harm to Stone #2 because if they had been aware that Stupnick was sexually abusing her, "they would [] have taken decisive action to protect [her]."  Docket Item 104-1 at 6.  But that begs the question of their liability.  And Stone #2 asks this Court to draw the opposite inference: that Castro and Hanzlian knew that Stupnick was sexually abusing Stone #2 but nonetheless failed to separate them.  *See* Docket Item 112 at 9.

At the motion to dismiss stage, the court must "draw[] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 566.  And for the reasons stated above, Stone #2 has alleged facts sufficient to allow this Court to draw the inference that Castro and Hanzlian knew that Stupnick was sexually abusing Stone #2 but nevertheless failed to adequately prevent further sexual abuse.[4]  Therefore, Castro's and Hanzlian's motion to dismiss is denied.

---

[4] Castro and Hanzlian also argue that recognizing an Eighth Amendment claim here would be bad policy because "any security official could [then] be removed by a bad actor" based on "a simple false complaint."  Docket Item 104-1 at 6.  But Stone #2 does not allege that Castro and Hanzlian knew about the sexual abuse based only on a single inmate report; on the contrary, she says that they corroborated that report based on "dozens" of interviews with inmates.  Docket Item 56 at ¶¶ 283-84.  And she says that despite that corroboration, Stupnick continued to work in close proximity to Stone #2.  *See id.* at ¶ 285.  So even if this Court could dismiss Stone #2's claim on the basis of its own policy judgment, Stone #2's claim does not necessarily raise the consequences that Castro and Hanzlian suggest.

10

## II.   MOTION FOR DEFAULT JUDGMENT

Stone #2 has moved for a default judgment against Stupnick.  Docket Item 135.  Stupnick has not appeared in this case, and he failed to answer the complaint and the amended complaint despite being served with it on August 29, 2020, Docket Item 136-2; likewise, he failed to answer the second amended complaint despite being served with it on February 25, 2023, Docket Item 128 (affidavit of service).  Because of Stupnick's failure to timely answer or respond to the second amended complaint, the Clerk of the Court entered a default on March 29, 2023.  Docket Item 131.  And when Stone #2 moved for a default judgment and this Court set a briefing schedule on that motion, Stupnick failed to respond.[5]  *See* Docket Item 137.

Because Stupnick is in default, this Court evaluates whether Stone #2 has "establish[ed] his liability as a matter of law."[6]  *Mickalis Pawn Shop*, 645 F.3d at 137.

---

[5] This Court denied Stone #2's first motion for a default judgment without prejudice because she did not include a certificate of service indicating that the motion was served on Stupnick.  Docket Item 134.  Stone #2 then renewed her motion and included a certificate of service.  *See* Docket Item 135; Docket Item 136-5.

[6] When deciding whether to enter a default judgment, courts in this Circuit also have looked to "the same factors [that] apply to a motion to set aside entry of default." *See, e.g., Strike 3 Holdings, LLC v. JB*, 2021 WL 2200509, at *1 (W.D.N.Y. June 1, 2021).  Those factors are: "(1) whether the defendant's default was willful; (2) whether the defendant has a meritorious defense to [the] plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment."  *Id.* (citation and internal quotation marks omitted).  Here, Stupnick was served with the second amended complaint, *see* Docket Item 128, but he has not answered it, appeared in this case, or otherwise defended against Stone #2's claims.  Indeed, he also has failed to respond to the motion for a default judgment.  *See* Docket Item 137.  Therefore, those three factors are satisfied with respect to the claims on which Stone #2 has established Stupnick's liability.  *See, e.g., Krevat v. Burgers to Go, Inc.*, 2014 WL 4638844, at *6 (E.D.N.Y. Sept. 16, 2014) ("[The defendant's] failure to appear, failure to respond to the [c]omplaint, and failure to respond to the [motion for default judgment] sufficiently demonstrate willfulness."); *id.* ("[W]here a defendant fails to answer the complaint, a court is unable to make a determination whether the defendant has a meritorious defense to the plaintiff's claims."); *Flanagan v. N. Star*

11

Stone #2 brings four claims against Stupnick: an Eighth Amendment claim under 42 U.S.C. § 1983, a third-degree rape claim under New York Penal Law § 130.25, a second-degree sexual abuse claim under New York Penal Law § 130.60, and a claim for battery under New York common law.  Docket Item 56 at ¶¶ 671-89.  For the reasons stated below, Stone #2 is entitled to a default judgment only on her Eighth Amendment and battery claims.

Stone #2 has not alleged viable claims under the New York Penal Law, and her motion for a default judgment therefore is denied with respect to those claims.  Courts in this Circuit generally have found that "criminal charges under New York law cannot be prosecuted by a private person."  *Patterson v. Patterson*, 2019 WL 1284346, at *7 (W.D.N.Y. Mar. 20, 2019) (citation and internal quotation marks omitted); *see also Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, 51 F. Supp. 3d 319, 348 n.19 (S.D.N.Y. 2014) (finding that a section of the New York Penal Law "cannot form the basis of a civil claim, nor can it form the basis of a [section] 1983 or related claim given that those statutes apply only to violations of federal constitutional rights").  And that includes the specific sections of the New York Penal Law that Stone #2 relies on here.  *See id.* ("Plaintiff does not have a private right to bring claims pursuant to New York Penal Law §§ [] 130.25(1) . . . and 130.60.").  Because Stone #2 does not have a private right to enforce sections 130.25 and 130.60 of the New York Penal Law, she is not entitled to a default judgment on her third-degree rape and second-degree sexual abuse claims.

---

*Concrete Constr., Inc.*, 2014 WL 4954615, at *7 (E.D.N.Y. Oct. 2, 2014) ("Without the entry of a default judgment, [the plaintiff] would be unable to recover for the claims adequately set forth in the [c]omplaint.").

12

Stone #2 has established Stupnick's liability on her Eighth Amendment and battery claims, however. "A correction[] officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or to humiliate the inmate, violates the Eighth Amendment." *Hayes v. Dahlke*, 976 F.3d 259, 275 (2d Cir. 2020). The "'principal inquiry' in determining if there was an Eighth Amendment violation 'is whether the contact is incidental to legitimate official duties . . . or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate.'" *Id.* (quoting *Crawford v. Cuomo*, 796 F.3d 252, 257-58 (2d Cir. 2015)).

Stone #2 says that Stupnick sexually abused her, including by digitally penetrating her and forcing her to engage in oral sex. Docket Item 56 at ¶¶ 236-75. Stupnick engaged in that conduct not out of any legitimate penological purpose, but instead for his own sexual gratification. *See id.* That is sufficient to establish that Stupnick violated Stone #2's Eighth Amendment rights.

Stone #2 also has shown that she is entitled to a default judgment on her common law battery claim. "Under New York law," a "'battery' is an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001). "The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive." *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 134 (2d Cir. 2005).

As mentioned above, Stone #2 alleges that Stupnick forced her to engage in sexual acts while she was an inmate at Albion and he was a correction officer there. New York State law provides that an inmate in DOCCS custody "is deemed incapable of

consent[ing]" to sexual contact with DOCCS employees.  N.Y. Penal Law § 130.05(3); see also Docket Item 56 at ¶ 2.  And Stone #2 has sufficiently alleged that Stupnick's contact, which included forced digital penetration and oral sex, was "wrongful under all the circumstances."  *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 450 (S.D.N.Y. 2022).

For the reasons stated above, Stone #2 is entitled to a default judgment on her Eighth Amendment and battery claims, but she is not entitled to a default judgment on her New York Penal Law claims.  "While a party's default is deemed to constitute a concession of all well[-]pleaded allegations of liability, it is not considered an admission of damages."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  A court must instead "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  *Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

Stone #2 has not included any calculation of her damages in her motion for a default judgment.  Instead, she generally "requests . . . damages, process service costs[,] and attorney's fees."  Docket Item 136 at ¶ 27.  Because Stone #2's damages cannot be calculated with reasonable certainty, the Court refers Stone #2's request for damages and other fees and costs to United States Magistrate Judge Leslie G. Foschio for an inquest.[7]

---

[7] On February 22, 2022, this Court referred this case to Judge Foschio for all proceedings under 28 U.S.C. § 636(b)(1)(A).  Docket Item 101.

**CONCLUSION**

For the reasons stated above, Castro's and Hanzlian's motion to dismiss, Docket Item 104, is DENIED. Stone #2's motion for a default judgment, Docket Item 135, is GRANTED in part and DENIED in part. Stone #2's request for damages, costs, and attorney's fees is referred to Judge Foschio for an inquest.

SO ORDERED.

Dated:   May 19, 2023
         Buffalo, New York

                                              */s/ Lawrence J. Vilardo*
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE